Case No. 18-1170 et al. Shamrock Foods Company Petitioner v. National Labor Relations Board Mr. Gossett, the petitioner. Mr. Heller, the respondent. Mr. Gossett, the respondent. Good morning, Mr. Dawson. Thank you, Your Honor. May it please the Court. Thank you, Your Honors. My name is Todd Dawson, and I'll be arguing today on behalf of Respondent Shamrock Foods. And I'll be focusing really on three points. First, the Board's orders in both cases really collapsed like a house of cards around the Board's indulgence of the union's apparent loss or destruction of key evidence. And these were surreptitious audio recordings of various meetings between Shamrock management and employees that were indisputably in the possession of the union. Second, the Board found a violation in regard to Mr. Wallace's separation agreement that General Counsel not only didn't pursue, but affirmatively disclaimed. A flaw that the Board doesn't even attempt to defend on its merits. Third, the Board improperly drew an adverse inference in General Counsel's favor to cure the General Counsel's failure to establish the supervisory status of floor captains. Of course, also address any questions that the panel may have regarding other claims or issues. But first, the house of cards and the union's affiliation of evidence. Despite relying heavily on a purportedly coercive context in finding the various violations alleged in both cases, the Board ignored the fact that that well was poisoned by the union's destruction of the most probative evidence on the context issue. Those were surreptitious audio recordings of interactions between management and employees. There's no dispute that the recordings exist or that they were given to the union as Steve Phipps, the General Counsel's primary witness, testified that he and other employees made the recordings and that he provided all of them, which included an entire flash drive to the union. When Shamrock subpoenaed the recordings, the union no-showed on the day of its response, didn't show for the remainder of trial, and produced nothing. Instead, the union's counsel claimed that, although the union still had, and I think this is important, the union still had copies of the recordings it selected to provide to the Board in support of its case. But as to the other recordings, union counsel had no idea what happened to them. And that's at pages 1552 to 1569 of the Joint Appendix. Surprisingly, in light of the Board's reliance on coercive context, the Board allowed us to be prejudiced in defending against all of the claims because we didn't have access to this critical evidence. What did you ask to be done? Your Honor, we asked for an adverse inference that there was no coercive context, and we would ask that the Court remand the case. Any claims that survived, we would ask to be remanded for the Board to reconsider its holdings without reference to the context. The ALJ found that there was no contumacious conduct, right? That was his finding, yes, Your Honor. And the Board adopted that finding, or the Board didn't set aside that finding? That's correct, Your Honor. And what is our standard of review of that finding? Your Honor, actually the standard of review is found in this Court's decision in UAW v. NLRB, which is in our brief. And as the Court recognized, in the UAW case, the deference afforded to the Board is based on the notion that it's going to diligently marshal and consider the evidence. And as the Court recognizes, when the Board doesn't do that, it goes to the fairness of the decision-making process as opposed to the correctness of the decision. So this is not an issue on which the Board is of deference. They failed to exercise evidentiary sanctions available to it. And as this Court recognized at page 1340 and 41 of the UAW case, that is grounds for reversal. But the decision on whether to impose sanctions is indeed a discretionary decision itself, right? It is a discretionary decision, but as recognized in the UAW case, Your Honor, where there's no dispute that there are responsive documents and no dispute that those responsive documents could be potentially controlling vital or dispositive, this Court said it is error for the NLRB not to exercise its discretion in favor of evidentiary sanctions. What about the evidence in the record that you withdrew your subpoena? There's no evidence. That was in the correspondence. That was in the correspondence from Union Counsel who said his understanding, not from us, his understanding was that the subpoena would be withdrawn. It never was. That's something that Counsel stated. I'm not sure what he based that on. But absent a finding that there was evidence within the possession, custody, and control of the Union that was willfully not produced, what are we supposed to do? There was no such finding. Well, Your Honor, there was no dispute. Steve Phipps testified. He gave all of these recordings to the Union. He testified that that included recordings that were not introduced in trial. And if Your Honor reads the correspondence, Union Counsel, even when asked specifically about Phipps' testimony, said I can't say what happened to the other recordings. There was no dispute, none, that the Union was in possession of these recordings. That the Union was not in possession? No, that the Union at some point was in possession of them. It was not. I'm sorry, Your Honor. There's no dispute that it had been. It had been. You're correct, Your Honor. But when he made that statement, there's no reason to doubt it. There's no reason to doubt it, but the subpoena asked if these had been lost, at least give us the author, the dates, and so forth. The Union provided none of that evidence. Well, I mean, I guess what I'm saying is that that doesn't get you over the finish line. I mean, you know, my wife has given me countless things that, you know, somehow no longer end up in my possession, custody, or control because I lose them. So that doesn't mean that, you know, there was some sort of willful destruction. It might mean that there was, you know, neglect or something. Well, Your Honor, I don't believe it's necessary to find that the Union acted in bad faith. The fact is that the Board relied on a coercive context that either could have been corroborated or negated by audio recordings that the Union had and somehow lost. So whether or not the Union did that by bad faith or not, it contaminated the proceedings because that evidence goes directly to the main reliance of the Board, which is this allegedly coercive context. There are a number of factual issues. For example, the incident with Ms. Garzon, there was a factual dispute over what was said. The incident with Mr. Garcia, a factual dispute over what was said. The incident between Mr. Manning and Mr. Phipps, a factual dispute over what was said. If audio recordings existed of those interactions, that undeniably would have changed or potentially would have changed, I should say, the outcome of that, of those claims. Now, the second point is that the Board found a violation regarding Wallace's proposed separation agreement that General Counsel affirmatively disclaimed. General Counsel alleged in Paragraph 50R of its complaint that Wallace's agreement was an unlawful work rule. When asked by the ALJ if General Counsel wanted to pursue an additional theory, General Counsel said, thanks but no thanks. And the Board agreed with Shamrock's argument that the General Counsel failed to make out a work rule violation but proceeded to find a violation anyway on General 8A1 principles, despite the affirmative statement that General Counsel was not pursuing that theory. The Board doesn't deny that we're right on the merits because it ignored the General Counsel's disclaimer that it was seeking this violation. What the Board claims is that Shamrock waived its argument by not raising it to the Board in a motion to reconsider. That's false. Shamrock raised this issue even in its post-hearing brief to the Administrative Law Judge, which is at page 1670 of the Joint Appendix. We also raised it in our- The error hadn't happened yet. I'm sorry, we raised the issue, Your Honor, by saying that General Counsel affirmatively committed to pursuing this violation only as a work rule and it should not be considered under any other framework. Okay, well then how did you preserve it once the Board made what you say is the error? So we filed in our exceptions, and Your Honors, I apologize, in going through the Joint Appendix, Joint Appendix 1707. Actually, the post-hearing brief is in the appendix. Our exceptions brief is not. But the quote at page 8 of our brief, there's a black quote, that was taken from our exceptions brief to the NLRB. And the fact is Member Kaplan agreed with our argument and said that he would have dismissed the claim and he thought it was improper to treat it as anything other than a work rule. So the idea that the Board didn't have a chance to address this issue is just false. One of the Board members actually agreed with us on the argument. Third, the Board improperly drew an adverse inference on Floor Captain's supervisory status based on an ambush-style subpoena that General Counsel served nine days before trial. The burden of responding to that subpoena was prejudicial in that we reviewed 100,000 pages of documents from which we produced 3,000, all while preparing for trial, but still were sanctioned. General Counsel has identified only one responsive document that wasn't produced. That's a job description for Floor Captains. That's kind of an important document, right? Your Honor, I would submit it's not. In the context of whether Floor Captains are supervisory employees. Your Honor, I would submit that it isn't. Under Golden Crest Health Care and prior case law, this is well established. A job description is not evidence of 211 authority. 211 authority has to be established by actual duties. Now, I'm not saying it isn't relevant, but it's certainly not controlling, vital, or dispositive. Two Floor Captains were subpoenaed, were present, ready to testify. Even if General Counsel didn't want to cross-examine them on their duties, she certainly could have examined them on any documents that might reflect those other than a job description. Or she could have called other witnesses. She did ask some of the hourly employees who testified. None of them were really able to provide evidence satisfactory to the Administrative Law Judge to establish 211 status. The Board claims that all the ALJ did was draw an adverse inference that the documents would have corroborated the testimony. But that's not true. If Your Honors read the opinion, it's at Note 29, I believe. What the ALJ actually said is he would draw an adverse inference that the documents would have corroborated the testimony and provided additional evidence of 211 status. This is not just a case where the ALJ said, well, it would have corroborated the testimony. No, he drew an adverse inference that additional evidence would have been provided. That, under Riverdale Nursing, is impermissible. You cannot fill a gap in the prima facie case of General Counsel by means of an adverse inference. The Board's recognized that. And Riverdale Nursing is immediately on point. The employer in that case was asked to provide documents concerning joint employment, or I want to say single employer status, produced nothing. And the Board, I'm sorry, the Administrative Law Judge drew an adverse inference, as is the case here. The Board said, you can't do that. The General Counsel's entire case primarily rested on the adverse inference. And the Board said that's impermissible. We made that argument in this case, and the Board ignored it. So combining these flaws with the errors described in briefing, which range from ignoring, not discrediting or distinguishing, but ignoring undisputed evidence, which is not permitted under the Substantial Evidence Test, as this Court recognized recently in Carpenters Local 2471, which we've cited in our brief, they've ignored Shamrock's 8C right to discuss unionization with its employees, and its own precedent, none of which is permissible. And with that, unless there's other, I'm happy to address any other questions I have. We'll let you reserve the remainder of your time. Thank you, Your Honor. Thank you. Mr. Heller. Good morning, and may it please the Court. Joel Heller for the National Labor Relations Court. Substantial evidence and credibility determinations support the Board's findings of over two dozen unfair labor practices committed by Shamrock Foods in response to its employees' union organizing effort. The Court should thus reject Shamrock's efforts to relitigate the hearing before the Court of Appeals and enforce the Board's order. I'm happy to address the points that Shamrock's counsel brought up today, but I would just like to start by reminding the Court that there's a lot more going on to this case. There are, as I said, over two dozen violations here, ranging from coercive statements, interrogations, surveillance, unlawful discipline, and discharge. We cannot ignore all that context when considering any particular issue at stake. There's never been an election, right? There has not been an election. That is correct. And the union is not representing any of these employees. What do you need? Certainly not in the record. I don't know what has happened. Do you need 30 percent authorization cards? Is that the number to get an election? To get an election, yes. 30 percent? I believe that's correct. So starting off with the point about the evidentiary sanctions. Now, Judge Wilkins, the standard of review on that issue is abuse of discretion. That's what the Court said as much in the Purdue Farms case. And so this, looking first at the sanctions or the lack of sanctions imposed on the union. And so the board's finding, as it described, is that there's no sanctions when the evidence is not in the possession of the subpoenaed party or doesn't exist. And so that is what the union counsel explained to all the parties, that these documents or these recordings were not in their possession, and that is why they were not provided. I would also point out that the testimony from Phipps that Shamrock refers to, which is at JA 626 and 627, about the recordings he made. He discusses recordings made of meetings with management, and all of those recordings were already in the record as general counsel's exhibits. The only other recordings he refers to are recordings he made of himself talking to other employees about the union and one disciplinary hearing. So there is no testimony regarding any other recordings of other meetings with the employer. And so there is no prejudice shown if the point is to say that there are other meetings with the employer and employees that would show a different non-coercive context. And with no prejudice, you can't show abuse of discretion. And the meetings that are in the record clearly show coercive statements made by high-level officials at all employee meetings and at small group meetings. And so the union counsel's statement that the subpoenaed recordings are not in his possession contrasts with the sanctions imposed against Shamrock as to the supervisory status issue, where Shamrock's counsel at the hearing stated he was sure that that's out there, those documents that were requested and were not provided regarding the job duties of the floor captains. I would also point out that the administrative law judge pointed out that the subpoena request for job duties regarding the floor captains was not only the first paragraph of the subpoena, but was also, as I'm quoting, the easiest paragraph to respond to, and yet Shamrock did not. In that situation, it was proper for the board to impose evidentiary sanctions, as is within its toolkit, as is recognized by the court in Purdue Farms and the board's decision in McAllister Towing. The adverse inference regarding the supervisory status was not the entirety of the case. As we go through in the brief and as is in the board's decision, there is credited corroborated testimony from multiple witnesses regarding the job duties of floor captains, and the adverse inference was that the documents that had not been provided would corroborate that testimony. And so we're not like the case cited by Shamrock Foods, where really the only reason for a finding in that case would have been the adverse inference. We don't have that here. The adverse inference pushes it over the top, but it is not the entirety of the evidence here. It was building upon other evidence in the record. The other point that was raised about Thomas Wallace. So the severance agreement follows after Wallace's unlawful discharge, which that finding, as we point out in the brief, is well supported by the facts in the case. The point about whether the, Judge Wilkins, as he pointed out, the finding that they're disagreeing with, that the severance agreement was an unlawful waiver, came up for the first time in the board's decision. And it is well established by Supreme Court precedent and this court's precedent that in that situation, when it's something sui sponte in the board decision, you have to file a motion for reconsideration to preserve the argument. Shamrock didn't do so here. They point to a phrase in their exceptions brief saying that, pointing out that it had been, that violation had been alleged as a work rule. But there's no legal argument regarding that it can't be, a violation can't be found on any other grounds. Because it's true, as this court has recognized and as the board has recognized, that in some circumstances the board can find a violation that is not alleged in the complaint. So long as it is closely related, the violation is closely related to the alleged violation. And there was an opportunity to litigate. Those are the types of arguments that had to be brought before the board in order to preserve the issue for appellate review under Section 10E. And so with that response to the points that Shamrock has made in appeal, I would again point to our brief for all of the, for the support of all of the other violations, which are, as Shamrock alluded to earlier, mostly about factual disputes. And the factual, the standard of view, of course, for that is substantial evidence. Many are also founded on credibility determinations. The standard for review there is whether it is patently unsupportable. I don't think any of the arguments have come to that level. And I guess with that, and if there are any, no further questions, rather, from the court, we will rest on our briefs as to those many violations. Well, I'm a little mystified about one very specific matter. Sure. And that is with respect to the discharge of Morales. Okay. One of the four, I think it was, elements which the board pointed was, or used to sustain, I should say, or conclude that the discharge was discriminatory, was that although there was no evidence of animus toward Morales in particular, it was a general anti-union animus. And that strikes me as rather ambitious, and virtually eliminating the need for any real showing of animus, in not just this case, but in all such cases. Has any court ever sanctioned that? There is. The standard for the elements to an unlawful discharge claim under the right-line test, that the employer engaged in protected activity, the employer knew of it, and then there was animus regarding union activity, that is well established. And those are the factors that have been adopted by other courts. I'm not sure if the specific issue you're discussing has come up before, and I don't really even see this as an argument that Shamrock is making in this case. I don't think there was even any invocation at that point in the ALJ's decision about the discharge, about any activities by Morales of which the employer was aware. There is. That were in any way related in time or substantively to the conduct in question. So Morales had engaged in union activity, and there is animus. Was it related in any way to the time? This was in February. 2016. February of 2016. And Morales had been handing out union flyers. He was one of the only, I believe, employees who was handing out union flyers. And those flyers, there was one in October, there was one in December, there was one in February. So there was an ongoing. February of 2016. February of 2016. That's the flyer related to the 10-J injunction. I believe that started being handed out February the 9th. And then the ALJ also rejected the company's argument or claim that this was a special circumstance involving a special order that had been lost. Do you remember anything about this? Pardon me. Let me see if I can argue more specifically. There had been some testimony from the White House manager, Vival, that one of the reasons for the discharge was that this was a special circumstance, that the pallet had arrived and had disappeared the same day, which is not true. And I believe Shamrock recognizes that's not true. There had been several days in between. The business about what day it was proves to be irrelevant. What the company's point was about saying it's a special circumstance, pardon me, was that this was a special order. It was. And there was only one pallet of this commodity. So there was no way to cover and fulfill the order. It had to go unfulfilled. So it was actually much more significant than another misplaced pallet might have been. And the ALJ doesn't deal with that. That may be the case factually, but I don't think it changes the analysis at all, because you still have the evidence of the inadequate investigation of the disparate treatment. On that one, the way in which the employer goes about an investigation in the past, I think it was maybe it was a board decision, maybe it was a court decision, was basically, I guess it was a court decision, held to be none of the board's business. I mean, as long as there was an investigation, and here they did quite a bit of investigating, as a matter of fact. So if I may respond with two points. One is it has been recognized by the board and this court, for example, in the Alice Van Hesse decision that an inadequate investigation can be evidence of an unlawful motive. Right, right. And what you're saying, what the ALJ did here was say, well, this was inadequate because they didn't follow up on this possibility for which there was nothing other than a suggestion. There was no evidence of it. If I may. They keep on spinning up possibilities, but it's not reasonable to insist that the employer have a policy of investigating every possibility. Sure, and two points in response to that. One, as your question makes clear, I think, this is not the board after the fact saying, these are the things you should have looked at to do an investigation. This was an issue that had been raised to Shamrock at the time by Morass. He spoke to Santa Maria, the HR official, and said, hey, look, several times that these, you're saying I'm the one that lost this pallet, but there are other people that could have moved it and the scanner had malfunctioned because that's something that happened frequently and Shamrock knew it happened frequently. So it's not something that after the fact the board is saying you should have looked into the scanner issue. It was an issue that had been raised contemporaneously to Shamrock. And the second point is why this is not just kind of an out there possibility is. Let's assume that the scanner fails from time to time in that part of the warehouse. And the evidence says it does. What's to be done about it? How do you investigate that? You investigate whether other employees had in fact moved the pallet that in between the time of Morass. That's what the whole investigation was about, whether someone else might have moved the pallet. And they didn't speak to it. Not whether the scanner failed, but whether someone else might have moved the pallet. They didn't look into that issue. They testified that they did not consider that issue. They had looked at the records at Morass' own scan records. They looked at the film and said there was no one else on the video. Well, if I may say something about the film. The video was not coextensive with the whole period. It was not. They looked at, they did a search for the pallet, which ultimately I believe was located. It was found nine feet away from where it had been scanned. Well, that makes it sound like they should have just, you know, should have been obvious. But apparently these things are stacked, what, 22 feet high or something like that? It goes pretty high. And they're layered. They're looking at a label to try to find this thing. It could have been anywhere. It happened to have been nearby. All the more reason to think it was misplaced by the forklift operator. And then on the point about discipline, why would it matter if you're looking for comparable discipline in prior instances? Why would it matter whether the forklift operator who's been disciplined was involved in incoming or outgoing pallets? The board didn't rely on the fact that he was inbound versus outbound. That wasn't part of the basis for finding this was on the wrong location. So that was the ALJ but not the board? I don't think the ALJ found it. The ALJ said these weren't really comparable because, in fact, the questioning, was tell me about another, whatever it was, outgoing pallet, forklift operator error. And then there's testimony that, if you get away from the inbound-outbound distinction, that these misfiling or misplacing put-away errors were not that uncommon and they were disciplined. I wouldn't say they were routine, but if they occurred, they were routinely disciplined. But the examples that were given were – so the distinctions that the board was drawing is not between inbound and outbound. Some of the examples were in different – they were in different jobs. They were not forklifters. They were not forklifters? They were receivers. The more pertinent point is that several of them were forklift operators. Some of them weren't forklift operators, so that was one point of distinction. Among the ones that were forklift operators – That's a point of nondistinction. Those are the relevant ones, in other words. Forklift operators are the relevant ones. Right. So my point is some of the examples that were given were not forklift operators, so we're saying those are not comparative. Yes. So let's look at – So the ones that were forklift operators, the things that they were disciplined for, were different in kind. There was destruction of – mistakes that led to the destruction of inventory. Forklift operations that led to that. Putting too heavy a load that then comes down. Yes. So that was put in the wrong place. And as a result, it led to destruction of property. So there's something different. So that's disciplined. And then you say, well, putting it in the wrong place without a crash is different? I believe it is different because it doesn't resolve in the destruction of inventory. It resolved in the pallet not being delivered. It was a lost sale, just like crushing the goods. I guess I'm hypothesizing at this point, but it could have been sent once it was found, so I'm not sure it was a – No, it was for an event. Once that truck left, it was too late. I apologize. You're correct on that point. But just one last point. ALJ's enthusiasm for this discharge, that matter, seems to be really so weak at almost every turn. I don't know how we can sustain it. Well, I would just, I think, rely more on going back to the investigation where this – just one last point, if I may, that this was not just some kind of random possibility, that it may have been someone else that had moved it subsequently, because the testimony is there's a lot of activity in this area of the warehouse. People have to move pallets because you have to get the pallet that's behind it or the pallet that's under it. No one else is picked up by a scanner. And when somebody makes a move that's not scanned, they're supposed to report that. My scanner didn't pick this up. Otherwise, you lose control of the inventory. I'm not sure there's evidence in the record saying what you're supposed to do when you're – Well, that they do is what the evidence says. Whether they're supposed to, I presume, but that they do is the evidence. Of the unfair labor practices that the Board found, how many of those was McClellan involved directly with? Two, I believe. One is the letter? The letter. What's the other? The other is there was his involvement in the discharge of Wallace. I mean, the Board found that the discharge would have been a violation even if McClellan wasn't involved, but that was the other one. And what about Engdahl? Engdahl was involved in more. I believe it's five or six. There are multiple coercive statements that were made. There was a promise or a grant of benefits during the union organizing campaign. He was involved in some of the disciplinary meetings and the threats. Did the Board discuss – I can't find it. Maybe it's there in these long footnotes – the propriety of this notice-reading remedy? The notice-reading is discussed in the ALJ's portion. Oh, I know that. That's not my question. My question is did the Board mention it? Did the Board make an additional statement other than adopting the ALJ? Right. No. No. I don't believe so. And the ALJ said that because McClellan was involved in numerous unfair labor practices, that he has to either read it or be present. You tell me he was involved in two. Is two numerous? Well, it says many of them were committed by high-level officials. Is two many? The number two. As a general matter, no, I suppose not. No, it's not. So the ALJ is wrong, right? But it doesn't – it says many of them were committed by high-level officials. It doesn't split it out between McClellan and Dahl. But that's its justification for having the CEO either read or be present. That's one of them. There's two reasons, given the severity and the scope of the unfair labor practices. It's just wrong, isn't it? Which part? What the ALJ says with respect to McClellan. Well, there's two points he makes. The severity and the scope of the unfair labor practices, one, and that's not affected by who was the one committing it. But that doesn't justify the CEO's presence. I thought the board's rule was that if the CEO or the president of the company or the plant manager was directly involved, then that justifies requiring the CEO or the plant manager to read or be present when the notice is read. That is one of the grounds, including that this court has accepted for the notice-reading remedy. Okay. The other is severity and the scope. And as I was alluding to, this court has approved a notice-reading remedy on multiple occasions from the board. Thank you. All right, thank you. All right, did Petitioner have time left? All right. Thank you, Your Honors. Judge Randolph, if I may address the question that you had about Mr. McClellan. As counsel mentioned, he was alleged to have been involved with two violations. The second violation he was not present for, it was just allegedly that Mr. Weibow said, this came from the McClellans to Mr. Wallace. Now, we have a recording of Mr. Wallace at the town hall meeting. We do not have a recording of the termination meeting. Does it exist? We don't know. But if it does, that would certainly, in our opinion, would show that that statement was never made. So really, it's the letter that went out, which according to the board on page 52 of its brief, it doesn't matter that the letter was facially neutral. It doesn't matter that it was never enforced in an unlawful manner. And it doesn't matter, and this is the most incredible point, which I think distinguishes it from other cases. The board says it doesn't matter even if employees would have interpreted it as applying to coercive activity. Now, this is just a letter saying no bullying, no unlawful coercion. And the board is saying, well, it doesn't matter if the employees would read it as impacting protected activity. That's the purpose of the act. So I think that's a critical, critical distinction. In regard to Mr. And your defense was 8C? Our defense is 8C, but technically I think you could say this is really just a First Amendment issue because it doesn't mention anything about labor relations in that letter. That's what 8C is. Well, 8C says that they can express their opinions on unionization. But in this case, there is no opinion on unionization. Oh, I see. It's just saying don't bully each other. Also, Justice Ginsburg, if I could go back, just to make sure. So Wallace was discharged. Mr. had got a seven-week written warning. And by the time the complaint, I believe, that warning had already rolled off his record. So there's no lasting impact of the discipline to Mr. Did you withdraw your objection? No, Your Honor. We had mentioned that to the board in the lead-up to the trial, and it did not persuade them to back off. So if they're going to allege a violation, obviously we're going to defend it. And you continue to defend it? And continue to defend it. At this point, I think we may have spent more than that salad dressing was worth at this point. I don't know. I'm sure. So nothing depends upon this? Well, I would say it does, Your Honor, in the sense that it plays into the extraordinary remedy that the board wants. Okay, fair enough. Standing alone, nothing depends on it? Yes, that is correct. If the remedy, the extraordinary remedy, would be warranted without regard to the inclusion of this particular charge, then the charge adds nothing? The charge really, it has no lasting impact. That is correct, Your Honor. But I would, if I may, and I know I'm running out of time here, the issue of the scanner, the board has never specified how we would investigate whether scanner connectivity was lost. We looked, or I should say Shamrock looked at Mr. Mraz's scan record. He was scanning every two to three minutes. He confirmed at trial that that shows his scanner was working. They had put antennas, new antennas, which is also in the record, new antennas in that area to cure the problem, and Mr. Mraz was not having a problem. Moreover. No, no, the suggestion by the aliens was that someone else moved the pallet, someone whose scanner wasn't working. Someone from, an alien from Mars, perhaps. The other issue, too, I think is important is they get paid by how many pallets they move. So if the scanner doesn't record a pallet move, the forklift driver makes sure it gets recorded because it affects his pay. He gets paid by that. And that's why they report. And that's why they report. Is McClellan still the CEO? Kent McClellan is. Mr. Norman McClellan, unfortunately, has passed away. But I don't believe, I don't believe Norman McClellan was required to be. I'm sorry, Your Honor. Mr. McClellan is still the CEO. Kent. Kent, yes. And how about Engdahl? Engdahl is still. Is he still the vice president? He is, Your Honor. All right, thank you. Thank you, Your Honor. Do you have any concluding remarks? No, just we'll rest on our briefing and appreciate the time. Thank you, Your Honor. All right, thank you. We'll take the matter under advisory. Stand, please.
judges: Wilkins, Ginsburg, Randolph